**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA**                     :

    **- v. -**                                              :

                                  **S1 18 Cr. 759 (JSR)**

**SAVRAJ GATA-AURA,**                            :

          **Defendant.**                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### GOVERNMENT'S SENTENCING MEMORANDUM
### REGARDING DEFENDANT SAVRAJ GATA-AURA


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America


VLADISLAV VAINBERG
MARTIN BELL
Assistant United States Attorneys
- Of Counsel -

## **Table of Contents**

I.     Factual Background ................................................................................................2

       A.     Overview of the Bar Works Scheme .......................................................2

       B.     Haddow's History of Prior Ponzi Schemes ............................................3

       1.     Schemes in the United Kingdom ............................................................3

       2.     Haddow Moves to the United States for a "Fresh Start" and Launches the Bitcoin Store Fraudulent Scheme ........................................................4

       C.     Gata-Aura Briefly Works in Haddow's Bitcoin Store Boiler Room ........................5

       D.     Gata-Aura Joins the Bar Works Scheme and Defrauds Investors ............................6

       E.     Gata-Aura Becomes Haddow's Right Hand Man and Develops an Agent Network that Solicits Close to $40 Million in Investments into Bar Works ............................7

       F.     The Scheme Unravels ...........................................................................10

II.    Guidelines Calculation..........................................................................................11

III.   Sentencing Legal Principles ................................................................................12

IV.    Section 3553(a) Analysis ....................................................................................14

       A.     The Nature and Circumstances of the Offense ......................................14

       B.     History and Characteristics of the Defendant .......................................22

       C.     The Need to Afford Adequate Deterrence ............................................26

V.     The Defendant's Request for a Non-Incarceratory Sentence Should Be Rejected ............27

VI.    Conclusion ...........................................................................................................28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA              :

   - v. -                              :

SAVRAJ GATA-AURA,                     :              S1 18 Cr. 759 (JSR)

        Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
## REGARDING DEFENDANT SAVRAJ GATA-AURA

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Savraj Gata-Aura a/k/a "Sam Aura" ("Gata-Aura" or the "defendant"), which is scheduled for July 27, 2020.

From approximately September 2015 through June 2017, Gata-Aura helped run a massive international Ponzi scheme in a co-working space company called Bar Works.   The scheme ensnared over 800 victims worldwide who invested over $50 million in co-working spaces that guaranteed an annual return of approximately 14-16% of their investment.   Among other things, investors were deceived about Bar Works' supposed profitability, the particular workspaces they invested in (which largely existed on paper only), and even the basic identity of Bar Works' management.   Specifically, while the Bar Works offering materials represented the company to have been founded and run by CEO "Jonathan Black," Black did not exist.   The real owner and operator of Bar Works was Renwick Haddow, a U.K. citizen who had previously gained notoriety for operating multiple widely-publicized Ponzi schemes in the U.K. through which investors lost millions of pounds.   For much of the Bar Works scheme, Gata-Aura served as Haddow's functional right hand man, and the force that brought nearly $40 million of investors' money through an extensive agent network fueled by huge commissions.   As discussed below, Gata-Aura

knew the truth about Haddow and "Jonathan Black."   He became aware of the fact that Bar

Works' legitimate revenues from paying members were too meager to even pay the company's

own expenses, much less support guarantees of 14-16% yearly returns to investors.   He knew that

investors were largely paid out of other investors' money.   He nonetheless lied repeatedly to

agents and investors to grow and prolong the Ponzi scheme and solicit new funds.   In exchange

for his efforts, Gata-Aura received approximately $3 million from victim funds.

The applicable Sentencing Guidelines range in this case is 97 to 121 months'

imprisonment.   The Probation Office has recommended a sentence of 60 months' imprisonment.[1]

The Government respectfully submits that in light of the magnitude of this fraud and Gata-Aura's

critical role in it, a sentence of incarceration between approximately 60 and 97 months would be

sufficient but not greater than necessary to serve the essential sentencing goals in this case.

## I.   Factual Background

### A.   Overview of the Bar Works Scheme

In July 2015, Haddow created Bar Works, a Manhattan-based company which purported to

adapt former bars, restaurants and other spaces into co-working venues with "workspaces" for rent

to the public in exchange for a membership fee.   PSR ¶ 15.   Over the course of the next two

years, Bar Works opened multiple locations in New York City, as well as in San Francisco and

elsewhere.   *Id.*   Haddow was Bar Works' sole owner. *Id.*

Haddow and co-conspirators including Savraj Gata-Aura and James Moore,[2] raised over

$50 million dollars from investors in Bar Works.   PSR ¶ 30. The investments were structured as a

---

[1]  The Presentence Investigation Report filed on February 11, 2020 is cited as "PSR."

[2]  James Moore was convicted following a week-long trial on June 7, 2019, *United States v. Moore*, 18-cr-00759-RMB (S.D.N.Y.).   Renwick Haddow testified at the trial pursuant to a cooperation agreement; the trial testimony is cited as "Tr.".   Moore and Haddow have not yet been sentenced.

"lease" and reciprocal "sub-lease" on individual workspaces in different Bar Works locations. PSR ¶ 16.   To purchase a lease on a single workspace, investors paid a purchase price, ranging from $22,000 to $30,000, and then would generally "sub-lease" their workspaces back to a Bar Works affiliate.   *Id.*   Bar Works, or its affiliate, agreed to pay each investor a guaranteed monthly "rental" fee for the lease's duration, regardless of whether a paying customer could be obtained for the investor's workspace.   *Id.*   The guaranteed yearly rent represented about 14-16% of the investor's investment.   In addition to the rent payments, Bar Works promised to return each investor's investment back at the end of ten years.   *Id.* The revenue to support these investor guarantees was supposed to come from paying members utilizing Bar Works' workspaces; beginning with its first offering documents, Bar Works claimed that it was "profitable."

### B.   Haddow's History of Prior Ponzi Schemes

#### 1.   Schemes in the United Kingdom

Prior to launching Bar Works, Haddow led multiple widely-publicized Ponzi schemes in the U.K. in which investors lost money.   PSR ¶ 17.   In November 2008, the Companies Investigation Branch of the Insolvency Service of the U.K., an agency responsible for investigating serious corporate abuse in the U.K. disqualified Renwick Haddow from serving as a director of any company registered in the U.K. for a period of eight years, through about November 2016. *Id.*   According to an online press release published by a U.K. government and public sector news service in December 2008, Haddow had served as a director of a failed U.K. company whose investors lost all or substantially all of their investments and agreed that he made various misleading statements about its financial position and prospects.   *Id.*

In July 2013, the U.K.'s Financial Conduct Authority ("FCA") brought a civil action against Haddow and others for allegedly running various unauthorized collective investment schemes, including a scheme involving African land ventures and another scheme selling

investments into carbon credits, that raised £16.9 million in funds through, among other things, misleading statements to investors.   PSR ¶ 18.   In February 2014, the High Court of Justice, Chancery Division ("High Court") ruled, in substance, that the schemes at issue were in fact unauthorized collective investment schemes.   *Id.*   The ruling was publicized online.   *Id.*   On or about March 26, 2018, the High Court additionally found that these schemes were unlawfully promoted to the public by false, misleading and deceptive statements and mandated that Haddow and his co-conspirators pay a total of £16.9m in restitution to victims.   *See* Press Release, FCA Wins Case Against Capital Alternatives Limited and Others, available online at

https://www.fca.org.uk/news/press-releases/fca-wins-case-against-capital-alternatives-limited-and-others (last accessed July 21, 2020).   Investors had lost substantially all their money in these schemes.

### 2.    Haddow Moves to the United States for a "Fresh Start" and Launches the Bitcoin Store Fraudulent Scheme

In or about October 2014, Haddow moved to the United States for a "fresh start" because, as he testified at James Moore's trial, he had "very bad reputation in the U.K., for a number of financial misendeavors which was covered on the internet, and it meant that I couldn't really operate further in the U.K."  Tr. 201.   Once here, Haddow first launched a fraudulent scheme selling investments into a non-functioning digital cryptocurrency company he created called Bitcoin Store.   Tr. 241-244.   The investments were sold out of a high-pressure boiler room Haddow set up in New York through another newly-created Haddow company called InCrowd Equity, Inc. ("ICE").   *Id.*   Haddow recruited aggressive salespeople through Craigslist postings and managed the boiler room himself.   Investors in Bitcoin Store were provided a "Private Placing Memorandum" that falsely touted that Bitcoin Store had generated gross sales of $7.56 million through April 30, 2015.   *Id.* In fact, the company did no business, Bitcoin or otherwise.   *Id.*   The offering documents intentionally omitted Haddow's name entirely and set forth fictional

4

biographies about Bitcoin Store's non-existent management.  *Id.*   From approximately May

2015 through December 2015, Haddow's boiler room raised over $700,000 from investors, who

lost substantially all their money.   *Id.*   On May 23, 2019, Haddow has pleaded guilty for his

orchestration of this scheme and Bar Works.   PSR ¶ 9.

### C.      Gata-Aura Briefly Works in Haddow's Bitcoin Store Boiler Room

Haddow knew Gata-Aura from the United Kingdom as the owner of a business called Core

Agents, who had access to agents skilled in selling various investment opportunities to the public.

In 2015, Gata-Aura was attempting to have agents sell investments in a U.K. company called Park

First with a business model strikingly similar to what was later adopted by Haddow for Bar Works.

Park First offered "leases" in airport car parking spaces that would be sub-leased back to the

company, with a "guaranteed" rate of return, reportedly raising approximately £230 million before

collapsing into bankruptcy amidst allegations of fraud.[3]

In or about the summer of 2015, Gata-Aura came to the United States and met with

Haddow.   Haddow offered Gata-Aura the opportunity to sell Bitcoin Store investments.   For

approximately three weeks, worked in Haddow's boiler room at ICE, reviewing Bitcoin Store's

brochures and making a small number of investor pitch calls, before declining to further participate

in the Bitcoin Store promotion, because he did not believe it to be a successful concept.   Gata-

Aura was paid at least $1,000 from Haddow for his work promoting Bitcoin Store.   The

Government does not allege that Gata-Aura necessarily knew that Bitcoin Store was a fraudulent

scheme during his limited participation in this promotion.   However, it bears noting that Gata-

---

[3] In October 2019, the FCA brought a legal action against Park First Limited, its CEO and senior managers, alleging that the Park First scheme involved an illegal collective investment scheme that raised approximately £230 million from 4,500 investors through the use of false or misleading statements. *See* Press Release, FCA Seeks Compensation for Park First Investors, available online at          https://www.fca.org.uk/news/press-releases/fca-seeks-compensation-park-first-investors (accessed July 17, 2020).

Aura knew that Haddow was running Bitcoin Store; Gata-Aura had access to Bitcoin Store's offering materials, which omitted any reference to Haddow; and Gata-Aura spent weeks working inside what Haddow himself testified was a "boiler room."   Nothing about this experience caused Gata-Aura to hesitate linking up with Haddow to promote Bar Works just a few months later.

### D.    Gata-Aura Joins the Bar Works Scheme and Defrauds Investors

In or about the Fall of 2015, Haddow began to establish the groundwork for a new Ponzi scheme in Bar Works.   The Bar Works investment was initially sold as an investment in equity or convertible loan notes of Bar Works itself, marketed through Haddow's ICE boiler room.   *See* Ex. A. (Bar Works Inc. Private Placement Memorandum).   However, by early 2016, Haddow had closed the boiler room and structured the investment as a lease/sublease into workspaces, to be sold by professional agent networks, *see* Ex. B (Bar Works Tribeca Private Placement Memorandum), as Park First had been successfully marketed and sold.   Gata-Aura helped Haddow devise these modifications to the Bar Works offering, including adopting the Park First model, and agreed with Haddow to bring in agents to market and sell Bar Works.   PSR ¶ 19.

Given the extensive reporting about Haddow and his prior Ponzi schemes on the internet, Haddow, Gata-Aura, and other co-conspirators agreed to conceal Haddow's role in Bar Works from investors.   PSR ¶ 20.   They claimed to investors the business was run by CEO "Jonathan Black" and that Haddow had little to no involvement in Bar Works.   *Id.*   Bar Works offering materials touted Black's leadership and supposed experience, and did not mention Haddow in any capacity.   *Id; see generally,* Exhibit A (Sample Bar Works    The workspace leases with investors were signed by "Johnathan Black."   In fact, as Gata-Aura well knew within a month into the scheme, Jonathan Black was a fictitious identity adopted by Haddow.   *Id.*

The Bar Works offering documents also falsely represented that the company was profitable.   It claimed, among many other things, that the first Bar Works location that opened in

October 2015 at 47 West 39th Street in Manhattan was "already profitable."   PSR ¶ 20.   But as

Gata-Aura knew, the first Bar Works location—out of which he worked—only had a small handful

of paying customers.   *Id.*   Even with heavy discounts to minimize the appearance of vacant

offices, Bar Works lured few legitimate customers.   These customers' subscription fees failed to

cover Bar Works' rent and company expenses, much less return any money for investors.   Indeed,

as Haddow testified, Bar Works was never profitable as a business.   Tr. 205.

Gata-Aura was Bar Works' Sales Director.   During much of his involvement in this

scheme, he worked at Bar Works premises. PSR ¶ 21.   He saw how the business was run.   He

interacted on a daily basis with Haddow and other Bar Works' employees.   He used Bar Works

email addresses.   *Id.*   He used Bar Works staff to process paperwork for investors recruited by his

agent network.   *Id.*   He was keenly aware of investor money coming in, maintaining a database

tracking each individual victim's investment, and recording his override share of commissions for

every victim.[4]

### E.     Gata-Aura Becomes Haddow's Right Hand Man and Develops an Agent Network that Solicits Close to $40 Million in Investments into Bar Works

At the beginning of the scheme, Gata-Aura was principally competing for commissions

with James Moore and an agent network operated through United Property Group ("UPG").   By

the summer of 2016, Moore and UPG left their partnership with Haddow over disagreements

around commissions, Gata-Aura's poaching of UPG agents into his own network, and in order to

begin selling a competing co-working space investment venture called Our Space.   PSR ¶ 37.

---

[4] In 2017, Gata-Aura was interviewed twice by the Government and voluntarily provided certain documents related to his connection to Bar Works and information identifying investors in Bar Works, among other things.   During these interviews, Gata-Aura substantially minimized his role in the offense and his own misrepresentations to investors.   Following Gata-Aura's guilty plea, the Government has requested that Gata-Aura voluntarily provide a more extensive export of the investor database and certain bank records to facilitate identifying all of the victims of this scheme and obtaining forfeiture and restitution.   Gata-Aura has voluntarily complied with this request.

After UPG stopped selling Bar Works, Haddow testified that Bar Works attracted investors "mainly through Sam Aura's network, and network of agents," as well as one other individual focused on soliciting investors directly (rather than agents). Tr. 394.   As Haddow testified, Gata-Aura was "in charge of establishing the sales network for [investments into] Bar Works.   Tr. 333.

Gata-Aura made numerous misrepresentations to investors as part of the scheme to cover up Haddow's involvement and legitimize the Bar Works' business.   PSR ¶ 25.   He distributed profit figures and projections to investors that he knew were made up.   *Id.*   He falsely claimed Bar Works was profitable.   He falsely sold investments into specific, numbered, workspaces as if they were real, income-generating desks.   He knew that most Bar Works' "workspaces" were simply numbers on an excel spreadsheet not connected to any physical workspace or income stream.

The defendant's powerful agent network brought in millions of dollars of investments each month.   Victims were solicited to purchase workspace leases in locations that in fact were not even opened or operating.   And for the locations that were open, sometimes, the investments solicited at times outpaced the number of any conceivable workspaces that could be operated there. When that happened, Gata-Aura and Haddow did not return any investment payments or cease selling.   Instead, at times, they consulted building codes to increase the hypothetical number of workspaces a particular location could be claimed to operate.   At other times, they transferred the investment to a different location, treating workspaces and locations as interchangeable.   And many times, they did nothing, registering more investments on workspace leases in locations than actually existed or could legitimately exist.   PSR ¶ 25.   All of this ensured that there would be no legitimate way, through Bar Works' actual business operations, to pay investors their guaranteed 14-16% interest, and return their principal within 10 years, without having to dip into more and more new investor money.

8

Gata-Aura's agent network predominantly recruited investors located outside the United States—victims who could not easily visit the locations, verify claims about the business, and see their workspaces for themselves.   When those victims or other interested parties insisted on visiting Bar Works in New York or asked to meet with "Jonathan Black," Haddow relied on Gata-Aura to meet with them instead.   For example, in March 2016, Moore e-mailed Haddow that a team of potential sales partners wanted to meet Jonathan Black in New York and record some clips with "Jonathan" for marketing purposes.   PSR ¶ 27.   Moore wrote to Haddow, "Guys How do we feel we can overcome the Jonathan issue…?? He's on honeymoon…!?!?"   *Id.*   At the time, Haddow was on his actual honeymoon.   *Id.*   Haddow, under his real name, wrote back, "They can meet Sam [Aura] and Zoe [Haddow's wife] and our new PR. That should be enough and you guys can keep them occupied."   *Id.*

Gata-Aura also personally promoted Bar Works to the public.   In April 2016, Gata-Aura appeared on the School for Startups Radio program, where he was directly asked how Bar Works was funded.   Mindful not to disclose that Bar Works' funding was overwhelmingly coming from investor money rather than actual company revenue, Gata-Aura falsely claimed the business was "very, very profitable as an entity" because of how the company leased and retrofitted spaces.

On August 10, 2016, Haddow, operating a jonathan.black@barworks.nyc account, e-mailed Gata-Aura on his samuel@barworks.nyc account, calling the CEO of Park First a "total scammer" who was selling the reported "best product on the market," and telling Gata-Aura, "Mate you need the kick the shit out of these negative cunts who say 'well RH [Renwick Haddow] is involved'."   PSR ¶ 28.   Consequently, Gata-Aura continued to press agents to sell Bar Works, lying to agents and investors that Jonathan Black was real and that Haddow was not running Bar Works.   *Id.*

As noted, there was insufficient demand for Bar Works workspaces from the public to

cover the company's expenses, much less the guaranteed payoffs to investors, and the investment scheme operated in a Ponzi-like fashion.   PSR ¶ 23.   Haddow was using new investment money to pay "rent" to old investors.   *Id.*   Haddow also used investor funds to pay Gata-Aura, Moore, and others for their participation in the scheme, as well as to fund his own lavish lifestyle.   *Id.*

As part of his agreement with Haddow, Gata-Aura was entitled to a commission of either 30% or 35% of investors' money brought in through his sub-agent network, minus the commission to be paid to the individual agents, which comprised a range of about 5%-25% of the investment. PSR ¶ 22.   In most cases, Gata-Aura collected approximately 5-10% of the investor's investment.   *Id.* In all, Gata-Aura received approximately $2,988,225 in commissions from investors' money.   *Id.* With Haddow's assistance, Gata-Aura also established a number of offshore entities to receive the proceeds of the scheme.   *Id.*

### F.    The Scheme Unravels

In January 2017, an investigative report appeared on the internet exposing Haddow as the architect of Bar Works, together with a history of his prior U.K. schemes.   PSR ¶ 24.   The report also provided evidence that Jonathan Black was fictitious.   As investors and agents began urgently questioning Gata-Aura about these revelations, he made blatant misrepresentations to continue covering up Haddow's role and keep the scheme running.   For example, on March 16, 2017, Gata-Aura met in person with a Chinese investor who previously purchased five leases for $125,000. PSR ¶ 29.   The investor sought reassurance from Gata-Aura about Haddow and Black, secretly recording the conversation.   *Id.*   In response, Gata-Aura doubled down on the lie that Black was a real person and spun a brazen tale about how Haddow (whose prior connection to Bar Works was now hard to outright deny) was now divorced from Bar Works:

> "Jonathan created Bar Works.   Renwick wanted to help.   He wanted to raise money by selling shares.   And he wanted 50 percent of the points for every share he sold.   So 50 cents on the dollar.   So Jonathan was like no, not going to do that.   But Renwick Haddow also – he was a big business man here in America.

So he used to find us locations, because Jonathan didn't know how to buy the lease.   And so they were friends.   Renwick wasn't running the business. Renwick was just Jonathan's friend.   Like we saw him, like, but he's nothing to do with Bar Works. . . . Renwick is already gone.   This is last year in the beginning.   Renwick was gone a long time ago."

*Id.*

Around the same time, Haddow and Gata-Aura also devised a plan to distance "Jonathan Black" from the company and announce the elevation of another Bar Works employee ("Employee-1") to a public leadership position.   In reality, as Gata-Aura knew, Haddow always maintained sole control of the company and its bank accounts.   In private text messages between Aura and Employee-1 sent in April 2017, Employee-1 stated that he signed "bogus 'ownership' papers" and that he has "been presented hither and yon to investors as the antidote to Jonathan Black and Renwick Haddow."   The plan failed to attract any significant number of new investors. In April 2017, having run out of new investors to victimize, Bar Works stopped making payments to investors.   PSR ¶ 24.   By June 2017, when Haddow was criminally charged, the scheme collapsed and Bar Works began to close its locations. *Id.*

Between about November 2015 and June 2017, Gata-Aura and his agent network raised approximately $39,972,000 from investors in Bar Works.   PSR ¶ 30.   During the same time period, Haddow paid Gata-Aura approximately $2,988,225 out of victim funds.   *Id.*

## II.   **Guidelines Calculation**

The Probation Office's calculation of the Guidelines is consistent with the parties' stipulated Guidelines range in the plea agreement.

Applying the 2018 Guidelines Manual, Gata-Aura's total offense level under the Guidelines is 30, calculated as follows:

- The applicable Guidelines manual for Count One is the November 1, 2018 manual.

- The Guideline applicable to the offense charged in Count One is U.S.S.G. § 2B1.1.

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(L), because the loss resulting from the offense charged in Count One exceeded $25,000,000 but was less than $65,000,000, 22 offense levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense charged in Count One involved 10 or more victims, 2 offense levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(10), because a substantial part of the fraudulent scheme charged in Count One was committed from outside the United States and the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, 2 offense levels are added.

- A two-level reduction for acceptance of responsibility is warranted, pursuant to U.S.S.G. § 3E1.1(a).   Furthermore, because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently, the offense level is decreased by one additional level pursuant to U.S.S.G. § 3E1.1(b).

Gata-Aura's criminal history category is I.   PSR ¶ 61.   Based on an offense level of 30 and a criminal history category of I, the applicable Guidelines range is 97 to 121 months' imprisonment.

## III.    Sentencing Legal Principles

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."   *Gall* v. *United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.   *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a), which are: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

Under Section 3553(a), "in determining the particular sentence to impose," the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Crosby*, 397 F.3d at 112. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id.* In so doing, it is entirely proper for a judge to take into consideration his or her own sense of what is a fair and just sentence under all the

circumstances.  *United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## IV.    Section 3553(a) Analysis

The Government respectfully submits that a substantial sentence of incarceration, between approximately the 60 months' recommended by Probation and the 97 months' at the low end of the Guidelines is necessary to reflect the seriousness and aggravated nature of Aura's crimes, provide just punishment, afford general and specific deterrence, and promote respect for the law.

### A.    The Nature and Circumstances of the Offense

The scope and magnitude of Gata-Aura's crime warrants a substantial sentence of incarceration.   The defendant played a critical role in the scheme.   As the Bitcoin Store boiler room experience showed, Haddow could not sell Bar Works with his own employees on any meaningful scale.   He needed access to hundreds of professional agents with thousands of leads around the world.   Given his notoriety and the use of the "Jonathan Black" pretense, Haddow also could not be the direct contact with these agents.    Accordingly, Haddow relied on a small group of co-conspirators—people who knew the truth about Haddow, his sordid history, and "Jonathan Black"— to recruit and serve as intermediaries for agents and investors in exchange for massive commissions.   Gata-Aura was, by far, the largest and most important source of investments into the scheme, especially after Moore left Bar Works to help run a competing co-working space investment scheme.   Gata-Aura recruited and served as the principal point of contact for over 100 sub-agents and subagent companies that pitched Bar Works to the public, walking them through the offering documents, responding to questions, and tracking each victim's investment.   Gata-Aura and his agent network are responsible for persuading over 800 people to invest close to $40 million into Bar Works over more than a year and a half.   By design, the vast majority of these investors were targeted outside the United States—people less likely to visit Bar Works' locations, who instead relied on the various misrepresentations in the offering documents.

Contrary to his suggestion to Probation (PSR ¶¶ 34-36), Gata-Aura was not innocently drawn into a legitimate business venture that happened to turn criminal through other people's actions.   Gata-Aura knew who he was dealing with.   He made the decision to team up with a notorious Ponzi scheme operator being sued by a British regulator for leaving hundreds of victims with losses of over £16.9 million in his wake.   He knew that Haddow kept opening new companies in whatever fields seemed likely to attract investor attention – going from offering investments in rice harvests and carbon credits in Africa, to running a boiler room selling Bitcoin investments, and now to offering investments in co-working spaces, popularized by the rise of legitimate companies like WeWork.   Gata-Aura knew about Haddow's black track record that left only investor losses in his wake, and he knew why Haddow couldn't use his real name in connection with Bar Works.   Gata-Aura did not care.   He saw the opportunity to earn massive commissions from investors around the world and plunged into the scheme.

The defendant's decision to join the scheme was not a one-time mistake or a fleeting lapse in judgment.   Time and time again, over the course of a year and a half, Gata-Aura made conscious choices to continue to facilitate frauds on hundreds of individual victims, and to cover up his fraud with lies and deception.   Gata-Aura knew that approximately a third of every investors' investment did not go into growing the Bar Works business, but went straight back to Gata-Aura and the subagents.   Every time he recruited a new agent and processed a new batch of victims' payments, he made a separate, conscious choice to steal from the victims.   And he made that choice repeatedly, over the course of more than a year and a half, being stopped only by Haddow's public exposure and the collapse of the scheme.   Notably, Gata-Aura did not choose to walk away from the scheme even when it became increasingly clear that it was operating a classic Ponzi scheme, with investors being paid out of new investors' money.   He tried to prolong it with more lies to agents and investors, and fantastical stories in which Haddow and Jonathan Black

15

were two different people.   This systematic, methodical, and egregious conduct supports a sentence between 60 and 97 months.

Gata-Aura's counsel suggests that he, like Icarus, flew too close to the sun.   (Def. Mem. 29.)   The comparison is ill-fitting in at least two respects.   First, unlike Icarus's one-time ill-fated, hubris-fueled flight, Gata-Aura's crime involved a conscious a repeated decision to engage in the same sinister ritual song and dance, with its requisite misrepresentations, over the course of a sustained period of time.   Second, Gata-Aura did not merely singe his own waxy wings by flying too high in pursuit of his dreams.   He was a predator.   He took other people with him – investors whom he had to know were, in many cases, investing their life savings in his venture.

Remarkably, the victims are largely absent in the defendant's narrative of his role in this scheme.   Where the defendant mentions them, it is to tacitly suggest that they were responsible for being duped because Haddow's real name could have been gleaned from a search of certain state licensing permits and Bar Works' internal documentation.   *See* Def. Mem. at 13 ("I was also able to rationalize my complicity in covering up Mr. Haddow as "Jonathan Black" because Mr. Haddow's real name was on all the titles, leases, permits, food and beverage licenses and various other documentation – all of which was all attainable with simple searches. Agents and investors alike regularly spotted Mr. Haddow's name when they did their due diligence. It did not seem as if anyone really cared.").

The defendant's breathtaking response is both false and appalling.   The victims did not "regularly spot[]" Haddow's name on titles, leases, permits, and licenses, because none of those internal Bar Works documents or regulatory records were ever made available to the victims by Bar Works.   That was the point of the lie.   Gata-Aura appears to have conflated his perfect insider's knowledge of the fraud with the false information fed to Bar Works victims.   For example, it is true that as part of their due diligence, certain sub-agents did ask Gata-Aura to share

Bar Works' own leases with landlords for the underlying properties.   Consequently, during the rare times when Haddow and Gata-Aura chose to share those types of documents with agents capable of bringing in substantial investments, Haddow and Gata-Aura had explicit discussions about being careful not to share pages that would show Haddow's own signature.   Thus, on August 8, 2016, Haddow, using the e-mail account "jonathan.black@barworks.nyc" forwarded Gata-Aura the lease between Bar Works Tribeca and the owner of the underlying real estate property.   Haddow flagged for Gata-Aura, "Make sure you check my signatures for instance page 18 before sending this off."   That signature page of the property lease had been signed by "Renwick Haddow" on behalf of Bar Works Tribeca. *See* Ex. C (e-mail and attachment excerpt).

Likewise, the notion that these victims, most of whom lived abroad, somehow had easy access to New York state liquor licensing documents, or even had a reason to search out Haddow's name when the offering documents and scheme participants went to great lengths to conceal it, is equally absurd.   This was a sophisticated fraud.   Victims who performed due diligence by searching for Jonathan Black's name on the internet found a fake LinkedIn page with his credentials. (*See* Statement 71, ██████ Ltr.)   When they visited or called Bar Works, they were met with real individuals working the business, including the defendant.   When they asked to speak to or meet with Jonathan Black, the defendant helped to head them off.

Gata-Aura's self-serving claim that no one "really cared" about the truth is also demonstrably false.   As soon as Haddow's connection to Bar Works was exposed online in January 2017, new investors wanted nothing to do with Bar Works, old investors tried desperately to pull their money out, and Gata-Aura went into overdrive with new lies to agents and victims to try to keep the scheme going.

While many of the victims cannot fly to New York and personally address the Court at sentencing due to the ongoing coronavirus pandemic, they have submitted over 90 letters and

statements describing the devastating impact of this fraud and urging the Court to hold the

perpetrators accountable.   A review of the victim impact statements is a haunting tour of the

varying kinds of human wreckage that can only exist in the wake of a fraud of international scope

and dimension.

One victim, who lost $500,000, describes the horrific financial, mental, and physical

damage of this fraud on his family:

> The impact was devastating for my own company and, above all, my family. That
> money was my savings after many years of hard work. In mid-May 2017[,] I
> discovered the fraud had taken place and on May 23rd, 2017 my daughter was born
> 5 weeks premature due to the stress my wife was experiencing after what happened
> with Bar Works. . . . We were saving money for our first house and for our growing
> family. After what happened with Renwick Haddow and Bar Works, our dreams
> had to be put aside. I'm still trying to recuperate the huge loss and also recover from
> the stress and immense pain caused by this scam. I moved to the US from Italy
> because I wanted to leave a country where criminals only receive a slap on their
> wrist as punishment. I wanted to live in a country where the system protects its
> people. That's why I decided to invest in the American economy. I recently started
> the process to become an American citizen because I still believe in this country
> and its system. I have spoken with many other victims around the world and they
> are still suffering a lot as well, after what happened with Renwick Haddow and Bar
> Works. I strongly hope that Renwick Haddow will pay the for the consequences of
> his crimes and all the damages that he caused me, my family and others.
>
> (Statement 3, ▮▮▮▮▮▮ Ltr.)

Another couple shares how this fraud robbed them of years of hard work and planning for

their family's future:

> I am a 46 year-old female, my husband is 9 and we have a 5 years old son. We are
> hardworking IT professionals who decided to save most part of our income for our
> retirement and for our son's university tuition. Every dollar has been hard earned
> with extra hours and being away from home. The trade-off of saving money for the
> future was curtail our current lives comfort and dreams. Future objectives made it
> worth it. Knowing that we have lost the hard earned dollars on the BarWorks
> investment made us feel so hopeless and depressive that it has been very hard to
> recover. It has been almost impossible to cope with the fact that all the effort made
> in the past was worthless and that it will take at least 20 years to recover financially.
> Our objective of slowing down so we could spend more time to our kid is not
> possible anymore. We just hope justice is done so no one else has to go thru this
> pain.

(Statement 6, ▮▮▮▮ Ltr.)

As Gata-Aura knew, the Bar Works investment was deliberately structured to incentivize victims to invest money into multiple leases to obtain the highest rental payments.   Because those payments were unconditionally guaranteed by Bar Works—and spurred by other lies about the company's profitability and its management—some victims pooled and borrowed money from family members, multiplying the scheme's devastation.   For example, one victim who borrowed money from his retired parents and brother to qualify for the highest guaranteed return, "hardly got 1 or 2 very small payments from this investment, then the money stopped coming. I contacted Bar Works and their UK agents' company many times but every time they give different excuse. . . .I lived in hell for months before I could break the news to my parents and my brother who lent me the money. This news was devastating to my parents as this money was their retirement money and for my brother, this was a big portion of his life time savings. This was the worst experience of my life; not only I lost my money and my family money. It also stressed the relationship with my parents and brother." (Statement 8, ▮▮▮▮ Ltr. at 1-2.)   Another couple who invested $125,000, including $25,000 that they borrowed and are still paying back "went through a range of emotions: distress, anger, physical anger and emotional stress to the point when [a spouse] began to lose large amounts of her hair."   (Statement 28, ▮▮▮▮ Ltr. at 1).

The victims are a diverse cross section of people of all ages, backgrounds, and life circumstances around the world.   They include parents who invested money from their children's savings to provide for a better future:   "When the scam was revealed with a broken heart I had to tell their children their money was gone."   (Statement 26, ▮▮▮▮ Ltr. at 1).   A divorced father whose resulting financial straits were compounded further by the COVID-19 pandemic and can now barely afford to see his children.   (Statement 30, ▮▮▮▮ Ltr. at 1).   A recent refugee from

the war in Yemen who saw a chance at stable income dissipate.   (Statement 63, ███ Ltr.)   A retired couple in Dallas whose $205,000 investment into eight Bar Works leases at three locations was "planned to be main source of our retirement income." (Statement 1, ███ Ltr.).   A younger couple in Lebanon that had to painfully delay having children while struggling to make ends meet after losing their investment (Statement 69, ███ Ltr.)

For many victims, the mental toll of losing their life savings, or money meant to secure their children's education future, has brought on profound depression and sent their life into a tail spin from which they have not recovered.   For example, one victim writes that the loss "affected both my family and work life, on many occasions even thought of suicide came to my mind. . . . This financial scam affected me mentally so much that my performance at workplace started falling terribly. At one point of time I was best performing employee since I joined the company in 2013, but from mid-2017 my performance at workplace started deteriorating . . . [and] in July 2019 I was made redundant by my company. For last 6 months I am without work and very frankly this scam has shattered my confidence so much that I am afraid of even meeting any recruitment consultant." (Statement 10, ███ Ltr.).

Victims previously comfortable are now "living paycheck to paycheck" (Statement 18, ███ Ltr.), or worse.   The damage travels across generations.   Some victims' families have had to reduce their medical insurance (Statement 15, ███ Ltr.), and struggle to pay for health needs for themselves or their family (Statement 24, ███ Ltr.)   They have been forced to back to their parents' home at age 50, (Statement 72, ███ Ltr.), or file for bankruptcy while experiencing post-traumatic stress syndrome caused by this scam (Statement 76, ███ Ltr.)

There are older people, pensioners whose days in the workforce have concluded, with no means of repaying their debts.   There is the septuagenarian woman in Great Britain who, sensing a golden opportunity, brought her mother, son, and daughter into Bar Works; the family has lost a

combined half million pounds.   (Statement 44, █████ Ltr. at 1).   Several retired victims, who have lost much of the money meant to secure their retirement, have now been forced to go back to the workforce and strain to find job opportunities in the current climate.   We highlight for the Court the letter from a retired couple in the United States, who worked their entire life to build a real estate business, and upon their retirement, generously shared one-third of the proceeds from its sale with their dedicated employees.   (Statement 17, ████████ Ltr.).   Having now lost much of their remaining hard-earned money to this scam, they are experiencing clinical depression, and "out of necessity are both now seeking employment once again. Unfortunately, at our ages, we are far less than marketable."   *Id.*   As ██████████ puts it, "If I live to be 100, as my mother, grandmother, grandfather have, I will likely do so in significant poverty because of these monsters who have no conscience. My wife the same. There are no words to help any judge or jury feel the pain and the darkness of deep depression that such a loss causes. However, we hope that our words might somehow help our pain and frustration to be at least understood and that the devastation of the future we now face because of this loss is considered as a final sentence is levied against those found guilty or who have admitted to such guile and corruption."   *Id.*

   Indeed, the sheer diversity of woe in Gata-Aura's wake distinguishes him from many other types of white collar fraudsters in this District.   This is not a case in which the measures of harm verge on the theoretical.   The defendant stole from hundreds of real people using false pretenses.   He did it on a grand enough scale to have caused tens of millions of dollars in damage. His sentence should reflect the reality of the pain he cause.

   The victims of this fraud reside not only in the United States, but approximately sixty other countries.[5]   A theme running through their letters is the trust they place in the United States justice

---

[5] The addresses associated with the victims include the following countries or territories:   Andorra, Argentina, Australia, Austria, Azerbaijan, Bangladesh, Belgium, Brazil, Bulgaria, Canada, the

system to hold fully accountable the people who robbed them of their savings.   They "strongly believe that the most free and fair US Justice system will do justice by punishing the criminal appropriately[.]" (Statement 10, ███████ Ltr.).   They ask the Court to recall the immense harm deliberately brought by Haddow and Gata-Aura on hundreds of innocent, unsuspecting victims when it evaluates the defendant's complaints about the consequences of his conviction in his bid for leniency:

> For his defence to be stating that Gata-Aura is now facing financial ruin is just incredible, if not a further "slap on the face" to all the people who invested in Bar Works. These devious rogues have ruined ours and other investors' lives through their despicable act perpetrated for their own selfish gain glamorized by posting images of their lavish life styles on social media. The audacity to put forward such a defence is revolting. Your Honour[], please, please, please, Let Right Be Done when sentencing.

(Statement 99, ██████ Ltr at 1).

### B.      History and Characteristics of the Defendant

Gata-Aura's upbringing was, at times, rather challenging, the result of his parents' marital difficulties first and foremost.   But by the time the defendant came to the United States, he had survived all of that, preserving the optimism and gumption that so many immigrants have brought to this nation, the initiative to pursue different business ideas and resilience to get up again when they occasionally end in disappointment.   For so many such people, America is a launching pad, a place to spin those vital personal qualities qualities into success.   For Gata-Aura, in spite of those qualities and more – his good education, his new spouse – greed curdled his situation.   He took the worst shortcut to success that exists by taking advantage of others.   And he was motivated by

---

Canary Islands, the Cayman Islands, China, Congo, Cote d'Ivoire, Cyprus, Czech Republic, Denmark, Egypt, England, France, Germany, Greece, Hong Kong, India, Indonesia, Ireland, Israel, Italy, Jamaica, Jordan, Kazakhstan, Kuwait, Lebanon, Liechtenstein, Malaysia, Malta, Mexico, Netherlands, New Zealand, Nigeria, Pakistan, the Philippines, Poland, Portugal, Qatar, Russia, Saudi Arabia, Scotland, Singapore, South Africa, Spain, Sweden, Switzerland, Taiwan, Thailand, United Arab Emirates, United Kingdom, United States, and Uzbekistan.

sheer greed.

Gata-Aura has submitted letters attesting to his positive personal qualities, and expressing surprise at his arrest and conviction.   It is, of course, appropriate for the Court to take these letters into account in connection with sentencing.   However, the Government asks that, in so doing, the Court consider the following four points.   First, the attestations to Gata-Aura's positive personal qualities do not distinguish him from other similarly situated white-collar defendants—individuals who, despite having many opportunities and a network of people who love and support them, nonetheless choose to steal and defraud.   As Judge Marrero astutely observed, this collection of letters:

> falls into a pattern advanced by a subset of the white collar criminal. . . . The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010).   Similarly, [whatever he does] while commendable, are not atypical for an educated white-collar offender and do not warrant a downward departure or variance.   *See United States* v. *Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)); *United States* v. *Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (defendant's civic contributions, not atypical for a prominent businessman, did not support nine-level downward departure); *United States* v. *Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's charitable and other good works did not justify departure from Guidelines); *United States* v. *Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities did not make him atypical).

23

Second, the letter writers' attestations to Gata-Aura's positive qualities have diminished value because Gata-Aura has demonstrated an extraordinary ability to deceive his family and friends about his criminal activities.   Indeed, the letters themselves are proof of this ability, as Gata-Aura appears to have successfully kept every person close to him out of the loop for the duration of a multi-million dollar fraud that would consume a normal man's every waking hour. He lied to victims.   He lied to agents.   Not much weight can be assigned the observations of people who, notwithstanding their fondness for the defendant, were clearly kept in the dark about who the defendant really was for over a year and a half.

Third, to the extent that Gata-Aura or the letter writers suggest that his humiliation and loss of social or professional standing as a result of his convictions warrant a lighter sentence, this claim should be rejected.   Any notion that successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot not be countenanced.   "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."   *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) (citing U.S.S.G. § 5H1.2); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no

24

special sentencing discounts on account of economic or social status.").   As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Finally, as discussed above, this is *not* a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life.   For over one and a half years, Gata-Aura advanced a massive Ponzi scheme and watched hundreds of investors' hard earned money pour in thanks to his deception.   The wall of criminality was built brick by brick, over many months.   *Today I'm going to tell someone else that Jonathan Black can be reached, but I can attend to that for them.   Today, I'm going to recruit another agent to spread investor pitch decks that contain misstatements.   Today, I'm going to respond to this poor bloke who's been asking for his money back.   Today, I'm not going to respond to these dozen or so investors asking the same.*   Aristotle once articulated that, "We are what we repeatedly do.   Excellent is not an act, but a habit."   So, too, is criminality. And for the sustained period of time in which Gata-Aura built and maintained this scheme with international and ultimately devastating reach, Savraj Gata-Aura was a criminal.

Accordingly, even crediting the testimonials Gata-Aura has submitted in connection with sentencing—and the Government does not in any way question their sincerity—the defendant has

shown himself to be a skilled and sophisticated liar, and not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

### C.      The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).   Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative."   *United States* v. *Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997).   "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."   *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted).   "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*

There is also a heightened need for specific deterrence in this case.   As noted, the defendant was motivated by greed, undeterred by the potential consequences.   When he decided to team up with Haddow to defraud investors, he knew that Haddow previously ran the African Land and Carbon Credits schemes through which investors lost £16.9 million pounds.   He knew that the FCA was actively suing Haddow and his accomplices for those frauds.   He knew that Haddow next tried to sell investors on a bitcoin investment out of an apparent boiler room.   None of that mattered to the defendant.   Far from being deterred by Haddow's history, Gata-Aura sought him out to join him.   He made some calls for Haddow out of the Bitcoin Store boiler room.   He grew to become the manager of Bar Works' entire fraudulent investment sales operation.   He was not deterred when the truth about Haddow's involvement in Bar Works was exposed to the public. He persisted with the scheme, and told increasingly brazen lies to investors.

It bears noting that even after criminal charges were brought against Haddow and Bar Works ceased as a business, Gata-Aura chose to continue soliciting investments from the public. The defendant founded U.S. Parking Investments ("USPI"), a company that claims to "offer exclusive, institutional grade commercial real estate opportunities to the everyday investor with a particular focus on high yielding parking lots."[6]   The public is encouraged to invest into USPI through their IRA retirement accounts, among other means.[7]   Despite USPI's website's pronouncements about their "18 year[] successful track record in operating parking lots successfully,"[8] according to the defendant's wife's, the parking lot actually managed by the company is not profitable.   PSR ¶ 100.   To be clear, the Government cannot currently state whether USPI has engaged in any investor fraud.   However given the defendant's history, the similarity of this business to Park First, and the defendant's decision to create a new vehicle to solicit investors after Bar Works collapsed, the Government has serious concerns about the defendant's willingness and ability to continue to defraud investors after serving his sentence. The Government respectfully submits that a significant prison sentence is necessary to truly impress upon Gata-Aura the wrongfulness of his actions and deter him from future misconduct.

## V.      **The Defendant's Request for a Non-Incarceratory Sentence Should Be Rejected**

The defendant's request for a non-incarceratory sentence barely warrants discussion.   The notion that deportation truly is a "fate worse than jail" (Def. Mem. 39) may naturally evoke some skepticism, but in any event, the lengthy trail of victims and the sustained nature of the scheme

---

[6] *See* https://www.usparkinginvestments.com/about (last accessed July 21, 2020).

[7] *See* https://www.usparkinginvestments.com/projects (last accessed July 21, 2020).

[8] https://www.usparkinginvestments.com/about (last accessed July 21, 2020).

suggested that Gata-Aura richly deserves both incarceration and deportation.   Moreover, consistency with the sentences of people who conduct frauds of similar scope demands that jail be a significant part of the outcome.   We understand this Court's past recognitions of the imperfect nature of the fraud-driven sentencing Guidelines.   But we also respectfully submit that it cannot be that a person who willingly causes tens of millions of dollars of fraud, with hundreds of real victims should escape without a meaningful sentence.[9]

The Government does recommend in this case a sentence slightly below the Guidelines. We do so in light of Gata-Aura's voluntary production of documents relating to victims of this scheme while the investigation was pending and after he was charged,[10] and his less culpable role in this scheme than Renwick Haddow, its creator and architect.   This is not to adopt the full extent of Gata-Aura's argument on that subject, which limply amounts to, "I wasn't Renwick Haddow." Gata-Aura was the day-to-day manager of a multimillion dollar component of an even greater fraud, and that warrants a substantial punishment, in the range of 60-97 months.

## VI.   <u>Conclusion</u>

On the facts of this case, a sentence between the Probation Office's recommendation of sixty months and the low end of the Guidelines range is appropriate and just.   Such a sentence would adequately reflect the seriousness of Gata-Aura's conduct, provide just punishment, and send a message to would-be fraudsters that a substantial jail term is the likely consequence of such criminal conduct.   By contrast, Gata-Aura's requested no-jail sentence is wholly unjustified,

---

[9] Likewise, Gata-Aura's likely financial penalties do not substantially influence our reflection on his Guidelines-range sentence. These are just and, to some degree, required components of his punishment, and do not distinguish him from the mass of similar defendants.

[10] We note specifically that the Government is not moving for a downward departure pursuant to Section 5K.1 of the United States Sentencing Guidelines.   What assistance Gata-Aura did provide was not sufficient -- or sufficiently unblemished -- enough to earn that species of relief.

would be perceived by the public as a slap on the wrist, and would fail to serve the essential

sentencing goals of affording deterrence and promoting respect for the law.   Gata-Aura also

should be ordered to pay forfeiture of $2,988,225 and restitution totaling $39,972,000 to the

victims as set forth in the PSR.

Dated:  New York, New York
        July 21, 2020

                                    Respectfully submitted,

                                    AUDREY STRAUSS
                                    Acting United States Attorney

                         By:    _____/s/_____
                                    Vladislav Vainberg
                                    Martin S. Bell
                                    Assistant United States Attorneys

cc:   Defense counsel (via ECF)